| | |
|---|---|
| HUGH HANSEN, on behalf of himself and all others similarly situated,<br><br>      Plaintiff,<br><br>v.<br><br>ARCHERY TRADE ASSOCIATION, INC; BOWTECH INC.; BPS DIRECT, LLC d/b/a BASS PRO SHOPS; CABELA'S LLC; DICK'S SPORTING GOODS, INC.; HOYT ARCHERY, INC.; JAY'S SPORTING GOODS; KINSEY'S OUTDOORS, INC.; LANCASTER ARCHERY SUPPLY, INC.; MATHEWS ARCHERY, INC.; and PRECISION SHOOTING EQUIPMENT, INC.,<br><br>      Defendants. | Civil No._____<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>JURY DEMAND |

Plaintiff Hugh Hansen ("Plaintiff") brings this class action on behalf of themselves and all persons and entities similarly situated against Defendants Bowtech Inc. ("Bowtech"); Hoyt Archery, Inc. ("Hoyt"); Mathews Archery, Inc. ("Mathews"); Precision Shooting Equipment, Inc. ("PSE"); BPS Direct, LLC d/b/a Bass Pro Shops ("Bass Pro Shops"); Cabela's LLC ("Cabela's"); Dick's Sporting Goods, Inc. ("Dick's Sporting Goods" or "Dick's"); Jay's Sporting Goods, Inc d/b/a Jay's Sporting Goods, ("Jay's Sporting Goods" or "Jay's"); Kinsey's Outdoors, Inc. ("Kinsey's"); Lancaster Archery Supply, Inc. ("Lancaster"); Archery Trade Association, Inc. ("ATA") (collectively "Defendants"), and named and unnamed co-conspirators. Plaintiff seeks treble damages, injunctive relief, and other relief pursuant to the federal antitrust laws for the anticompetitive conduct alleged herein and demands a trial by jury on all triable matters. Based upon personal knowledge and investigation by counsel, Plaintiff alleges as follows:

## I. NATURE OF THIS ACTION

1. Plaintiff brings this action on behalf of himself individually and on behalf of a class consisting of all direct purchasers of Archery Products[1] that purchased those products from at least January 1, 2014 until the present (the "Class Period"). Plaintiff brings this action for injunctive and putative relief under Section 1 of the Sherman Act. Plaintiff alleges that Defendants conspired to fix the prices of Archery Products being sold throughout the United States. As a result of Defendants' unlawful conduct, Plaintiff and the other class members suffered antitrust injury for which Plaintiff seeks treble damages and injunctive relief. Plaintiff also demands a jury trial.

2. Defendants are Archery Products manufacturers Bowtech Inc. ("Bowtech"); Hoyt Archery, Inc. ("Hoyt"); Mathews Archery, Inc. ("Mathews"); and Precision Shooting Equipment, Inc. ("PSE") (collectively "Manufacturer Defendants"), multi-channel sporting goods retailers BPS Direct, LLC d/b/a Bass Pro Shops ("Bass Pro Shops"); Cabela's LLC ("Cabela's"); Dick's Sporting Goods, Inc. ("Dick's Sporting Goods" or "Dicks"); Jay's Sporting Goods, Inc d/b/a Jay's Sporting Goods, ("Jay's Sporting Goods" or "Jay's"); Kinsey's Outdoors, Inc. ("Kinsey's"); and Lancaster Archery Supply, Inc. ("Lancaster") (collectively "Retailer Defendants"), and industry trade association Archery Trade Association, Inc. ("ATA") (collectively with other Defendant groups, "Defendants"), as well as co-conspirator software producers TrackStreet, Inc. ("TrackStreet") and NeuIntel LLC, d/b/a PriceSpider f/k/a Oris Intelligence ("Oris") (collectively "Software Co-Conspirators"). The Manufacturer Defendants are some of the largest producers and brands in the Archery Products industry in the United States. Similarly, the Retailer Defendants are among the largest sporting goods retailers in the United States and the largest retailers of Archery Products.

3. The ATA is the primary trade association in the Archery Products industry, with

---

[1] As defined below, "Archery Products" consists of bows, arrows, arrowpoints, targets, and accessories.

membership consisting of manufacturers, distributors, retailers, and other participants in the supply chain for Archery Products. As of 2023, ATA membership included over 2,500 businesses and organizations, with ATA stating that "all sectors of the industry are ATA members." Manufacturer and Retailer Defendants exercised significant influence over the ATA, with, as shown herein, Defendants' occupying several seats on the ATA Board of Directors in each year of the conspiracy.

4. Prior to the conspiracy, price competition within the industry drove prices for the products in question down, impacting profit margins for manufacturers and retailers. Defendants realized the necessity to act collectively to implement and vigorously enforce minimum advertised price ("MAP" or "MAPs") policies throughout the industry in order to combat true price competition. These policies were intended to eliminate price competition and increase profit margins for manufacturers and retailers. MAP policies work by establishing a lowest-possible price for specific products, below which no retailers could advertise that product. ATA acknowledged these policies were *de facto* price floors, stating "MAP policies level the playing field for all retailers, and eliminate the 'race to the bottom' that would occur if retailers endlessly competed to reduce prices."

5. While some MAP policies existed within the industry prior to the establishment of the conspiracy, collective enforcement was lacking, rendering them ineffective. This lack of enactment and enforcement made economic sense because unilateral adherence to MAP policies was not in any one company's economic self-interest. Individual market participants adhering to MAP policies risked being undercut on price and losing market share to their respective horizontal competitors that were not adhering to such policies. The Defendants recognized that each company's unilateral economic self-interest to compete on price could only be overcome by an anticompetitive agreement and collective action. Leading them to establish and enforce their conspiracy.

6. A successful conspiracy to fix prices through MAP policies therefore would require

continuous monitoring of competitors to ensure that conspirators adhere to the agreements and to detect conspirators not adhering to the conspiracy, in this case by selling products below the minimum advertised price.

7.    To this end, Defendants engaged in a continuous exchange of competitively sensitive information through multiple channels, which further suppressed price competition and permitted Defendants to monitor each other's adherence to the conspiracy.

8.    The ATA served as the centerpiece of Defendants' conspiracy, allowing the Manufacturer and Retailer Defendants to adopt MAP policies while assuring those Defendants that others would be doing the same. For example, the ATA conducts extensive industry surveys, available free only to members. These surveys included "hard data for trends in archery sales broken down by bow type, services, and more, as well as customer buying habits and demographics." ATA also conducts surveys and presents compiled industry data at its annual Trade Show for the express purpose of showing how ATA members' prices "stack up against your peers." The ATA created a myriad of opportunities for Defendants to meet in person and exchange sensitive information, including the annual ATA Trade Show where Defendants did often meet to discuss the conspiracy.

9.    In a competitive market, this kind of sensitive information would allow industry participants to undercut each other on price and steal market share. Therefore, it would be contrary to a firm's self-interest to share such information with competitors. However, in an enforced conspiracy, access to this sensitive competitive information serves as the tool to monitor that cartel members are adhering to the conspiracy and declining to pursue co-conspirators' market share.

10.    Beginning no later than January 1, 2014, Defendants conspired, colluded, and entered into an agreement to artificially raise, fix, maintain, or stabilize prices of Archery Products. Defendants' actions resulted in Plaintiff and Class members paying supracompetitive prices for

Archery Products in the United States. Defendants' anticompetitive conduct, described further herein, violates Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3), and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a), 26).

## II.    JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, as this action arises out of Sections 1 and 3 of the Sherman Antitrust Act (15 U.S.C. §§ 1, 3) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a), 26). Plaintiff also seeks damages in excess of $5,000,000 and at least one member of the putative class is a citizen of a state different from that of one of the Defendants.

12.    Venue is appropriate in this District pursuant to 15 U.S.C. §§ 15 and 22, as well as 28 U.S.C. § 1391(b) and (c), in that at least one or more of the Defendants resided or transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this district.

13.    This Court has personal jurisdiction over Defendants because they: (1) transacted business throughout the United States, including in this District; (2) have substantial contacts within the United States, including in this District; and/or (3) are engaged in an antitrust conspiracy that was and is directed at, and had and has the intended effect of causing injury to, persons residing in, located in, and/or doing business in the United States, including in this District.

14.    The activities of the Defendants and all co-conspirators, as described herein, were intended to and did have a direct, substantial, and reasonably foreseeable effect on interstate commerce in the United States, including in this District. Defendants sell their products and services in the continuous and uninterrupted flow of interstate commerce, including in, into, and from this District.

## III.   PARTIES

### A.   Plaintiff

15.     Plaintiff Hugh Hansen is a Tennessee resident. Plaintiff purchased Archery Products that were Manufactured by one or more of the Manufacturer Defendants and sold by one of the Retailer Defendants. The Archery Products that Plaintiff purchased were sold at artificially inflated prices due to the conduct by Defendants as alleged herein. Plaintiff has therefore suffered antitrust injury as a direct result of the antitrust violations alleged in this Complaint.

### B.   Defendants

#### 1.   Manufacturer Defendants

16.     Defendant Bowtech Inc. ("Bowtech") is a Delaware corporation with its primary place of business at 90554 Highway 99 N., Eugene Oregon. Throughout the Class Period, Bowtech sold Archery Products in interstate commerce in the United States. Bowtech was a member of the ATA, produced and sold Archery Products subject to Minimum Advertised Pricing policies, and participated in a conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

17.     Defendant Hoyt Archery, Inc. ("Hoyt") is a Utah Corporation with its primary place of business at 593 N. Wright Brothers Dr., Salt Lake City, Utah. Throughout the Class Period, Hoyt sold Archery Products in interstate commerce in the United States. Hoyt was a member of the ATA, produced and sold Archery Products subject to Minimum Advertised Pricing policies, and participated in a conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

18.     Defendant Mathews Archery, Inc. ("Mathews") is a Wisconsin corporation with its primary place of business at 919 River Road, Sparta, Wisconsin. Throughout the Class Period, Mathews sold Archery Products in interstate commerce in the United States. Mathews was a

member of the ATA, produced and sold Archery Products subject to Minimum Advertised Pricing policies, and participated in a conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

19.     Defendant Precision Shooting Equipment, Inc. ("PSE") is a Delaware corporation with its primary place of business at 2727 North Fairview Ave., Tucson, Arizona. Throughout the Class Period, PSE sold Archery Products in interstate commerce in the United States. PSE was a member of the ATA, produced and sold Archery Products subject to Minimum Advertised Pricing policies, and participated in conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

## 2.     Retailer and Distributor Defendants

20.     Defendant BPS Direct, LLC, d/b/a Bass Pro Shops ("Bass Pro Shops") is a Delaware corporation with its primary place of business at 2500 E. Kearney St., Springfield, Missouri. Throughout the Class Period, Bass Pro Shops sold Archery Products in interstate commerce in the United States. Bass Pro Shops' was a member of the ATA, sold Archery Products subject to Minimum Advertised Pricing policies, and participated in a conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

21.     Defendant Cabela's LLC was a Delaware limited liability company with its primary place of business at 1 Cabela Drive, Sidney, Nebraska. In 2017, Cabela's was acquired by Bass Pro Shops. Throughout the Class Period and until its acquisition, Cabela's sold Archery Products in interstate commerce in the United States. Cabela's was a member of the ATA, sold Archery Products subject to Minimum Advertised Pricing policies, and participated in a conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

22.     Defendant Dick's Sporting Goods ("Dick's") is a Delaware corporation with its primary place of business at 345 Court St., Coraopolis, Pennsylvania. Throughout the Class Period,

Dick's sold Archery Products in interstate commerce in the United States. Dick's was a member of the ATA, sold Archery Products subject to Minimum Advertised Pricing policies, and participated in a conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

23.     Defendant Jay's Sporting Goods, Inc. d/b/a Jay's Sporting Goods, ("Jay's Sporting Goods" or "Jay's") is a Michigan corporation with its primary place of business at 8800 S. Clare Ave., Clare, Michigan. Throughout the Class Period, Jay's sold Archery Products in interstate commerce in the United States. Jay's was a member of the ATA, sold Archery Products subject to Minimum Advertised Pricing policies, and participated in a conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

24.     Defendant Kinsey's Outdoors, Inc. ("Kinsey's") is a Pennsylvania corporation with its primary place of business at 1660 Steelway Drive, Mount Joy, Pennsylvania. Throughout the Class Period, Kinsey's sold Archery Products in interstate commerce in the United States. Kinsey's was a member of the ATA, sold Archery Products subject to Minimum Advertised Pricing policies, and participated in a conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

25.     Defendant Lancaster Archery Supply, Inc. ("Lancaster") is a Pennsylvania corporation with its primary place of business at 2195A Old Philadelphia Pike, Lancaster, Pennsylvania. Lancaster describes itself as "a leading worldwide archery distributor" with its own retail location and internet storefront. Throughout the Class Period, Lancaster sold Archery Products in interstate commerce in the United States. Lancaster was a member of the ATA, sold Archery Products subject to Minimum Advertised Pricing policies, and participated in a conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

    3.     **Archery Trade Association**

8

26.     Defendant Archery Trade Association ("ATA") is Virginia corporation with its primary place of business at 117 South Valley St., New Ulm, Minnesota. ATA is a members-only trade association that works to further the economic interests of participants involved in the manufacture, wholesale, retail, sales, and distribution of Archery Products. Throughout the Class Period, the ATA was an active participant in the conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States. ATA facilitated exchanges among the Manufacturer and Retailer Defendants of detailed, non-public, competitively sensitive information regarding, among other things, prices, capacity, demand, sales volume, future sales strategy, and other key pricing and sales metrics in furtherance of the conspiracy.

### C.     Co-Conspirators and Agents

27.     Defendants participated in the alleged conspiracy through the acts of their officers, directors, agents, partners, employees, representatives, affiliates, subsidiaries, and companies they acquired through mergers and acquisitions while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs, and for whom they are liable.

28.     Various persons and entities that are not named as Defendants participated as co-conspirators in the violations alleged herein and have performed acts in furtherance thereof. Plaintiff reserves the right to name some or all of these entities as Defendants. Defendants are jointly and severally liable for the acts of their co-conspirators whether or not they are named as defendants in this litigation.

29.     Neuintel LLC, d/b/a PriceSpider, f/k/a Oris Intelligence ("Oris") is a California corporation with its primary place of business at 20 Pacifica, Suite 1000, Irvine, California. Oris created and provided software to Defendants that allowed them to police and enforce their MAP policies in order to raise prices on Archery Products. Throughout the Class Period, Oris

participated in a conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

30.     TrackStreet, Inc. ("TrackStreet") is a Delaware corporate with its primary place of business at 9811 W. Charleston Blvd., Suite 2-776, Las Vegas, Nevada. TrackStreet created and provided software to Defendants that allowed them to police and enforce their MAP policies in order to raise prices on Archery Products. Throughout the Class Period, TrackStreet participated in a conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

## IV.    FACTUAL ALLEGATIONS

### A.     The Relevant Market

31.     The principal relevant market to this claim is the "Archery Products" market. The relevant geographic market is the United States.

32.     "Archery Products" refers to products used by consumers for bowhunting or archery. The associated products include but are not limited to: (1) bows (compound bows, recurve bows, longbows, and crossbows) and their components; (2) arrows and their components (shaft, fletching, and nock, but not including the arrowheads themselves); (3) arrowheads (or arrowpoints) which includes broadheads and field points; (4) targets (bag targets, foam targets, and 3D targets); and (5) accessories (including but not limited to bow cases, arrow quivers, sights, scopes, and stabilizers).

33.     There is a significant market for Archery Products in the United States. According to the ATA, in 2020 there were an estimated 9.9 million bowhunters, 17.6 million recreational archers, and 5.4 million competitive archers above the age of fifteen.

34.     The United States' retail market for Archery Products has grown considerable over the past five decades. In 2024, this market was estimated at roughly $1.2 billion.

35.     Archery Products are extremely costly, with the bows themselves being the costliest equipment. According to a 2023 ATA report, only 7% percent of bows cost under $300, while 28% cost between $300-$600, 16% cost between $600-$900, 23% cost between $900-$1,200, and 19% cost more than $1,200.

36.     Archery Products are sold to consumers by retailers, who purchase their Archery Products either directly from manufacturers, or through distributors who purchase directly from manufacturers. In general, multi-channel retailers, such as national sporting goods stores, source their Archery Products directly from manufacturers.

37.     Defendants' conspiracy to raise Archery Product prices by adopting, implementing, and enforcing MAPs impacted consumers across the entire United States. Millions of individuals representing every state participate in archery, and accordingly, purchase Archery Products.

38.     Defendants and their co-conspirators possessed market power at all relevant times at the manufacturing, distribution, and retail levels in the Archery Products supply chain in the United States. Market power at each level of the supply chain made possible a scheme to significantly raise prices above competitive levels without risking losing a proportional number of sales.

**B.      The ATA's and its Role as the Centerpiece of the Conspiracy**

39.     The Archery Trade Association is the primary archery trade group in the United States, composed primarily of businesses that manufacture, buy, and sell Archery Products. According to the ATA, its membership has risen from 505 members in 2000 to over 2,500 members in 2023.

40.     ATA membership allows access to member-only benefits like attending ATA Trade Shows, use of the ATA Connect online forum, and a Member Directory, amongst others.

41.     The ATA's website describes the process for a perspective member's application

to be reviewed and verified by an ATA staff member. ATA membership is categorized "based on the verification documents provided. Each membership category description includes a list of the required verification documents for that category."

42.    Many ATA members are horizontal competitors along multiple levels of the Archery Products supply chain. Among ATA members, 80% of its members belong to businesses along the Archery Products supply chain, including manufacturers, distributors, and retailers.

43.    ATA member-exclusive events and resources allow horizontal-competitors to discuss shared financial interests regarding Archery Products. The ATA's Board of Directors, the ATA Retail Council, the annual ATA Trade Show, and "ATA Connect" all provided Defendants opportunities to meet and conspire about implementing industry-wide MAPs on Archery Products without the presence of consumers.

44.    The ATA is governed by a **Board of Directors**, which is comprised of representatives from Archery Product manufacturers, distributors, and retailers. Defendants at each level of the Archery Products supply chain have occupied several seats on the ATA's Board of Directors in each year of the conspiracy.

45.    In fact, throughout the Class Period, there have been actual or potential competitors serving simultaneously on the ATA Board of Directors. Manufacturer Defendants Bowtech, Hoyt, Lancaster, Matthews, and PSE, were all Board members in 2018 and 2019. Retailer Defendants BPS, Cabela's, Jay's Sporting Goods, and Kinsey's were all on the Board in 2015, with multiple of these Defendants on the Board in each year from 2014 through 2024.

46.    Members of the ATA's Board of Directors have openly supported strict MAP enforcement. One ATA Board member credited MAP policies and relentless enforcement as a big part of his company's high sales.

47.    The ATA, under the direction of its Board members, has promulgated

anticompetitive rules and guidelines, like MAPs, to artificially diminish competition and increase prices in the Archery Products market in the United States.

48.     Along with its Board of Directors, in 2016 the ATA revitalized its **Retail Council** to "provide more guidance and support to the organization's retail members." The Retail Council, led by members of the ATA Board of Directors and multiple Defendants is intended to "improve the industry's archery and bowhunting markets." There have been multiple competitor Defendant who have served on the Retail Council each year of the conspiracy.

49.     Mark Copeland, a Retail Council Chair and the general manager of Defendant Jay's Sporting Goods, described the need for the Retail Council by saying, "[w]e've needed an active and engaged platform for retailers to discuss important issues where the conversation is educational and productive . . . I'm appealing to every archery retailer to use our backbone to step up and be part of the solution."

50.     The ATA's Retail Council "meets weekly to discuss pressing issues raised during strategic-planning meeting[s]." This includes MAP policies and their enforcement. Kurt Smith, the ATA's Director of Industry Relations for the Retail Council has called MAP policies "probably one of the most talked about topics in the archery industry." He advised retailers to establish and enforce MAP policies so "distributors and retailers [can] catch violators [and] cut them out of the supply chain and force them to look for easier prey."

51.     Other Retail Council members have supported implementing MAP policies. Support for MAP policies came from one Retail Council member who said that Archery Products manufacturers "should create MAP policies and retailers should honor them . . . every business must work together as a group to be productive and profitable, which includes strong MAP policies and procedures." Another member of the  Retail Council warned that "disobeying MAP policies . . . can have big consequences."

### 1. ATA Trade Shows

52. The ATA hosts an annual Trade Show, which is only open to ATA members. In 2011, the ATA implemented the membership requirement as an attempt to "prevent[] the attendance of those who undercut the ATA's pro shop dealers. . . ."

53. The ATA Trade Show brings together horizontal competitors across each level of the Archery Products supply chain. ATA Trade Shows are well-attended by industry participants. At the 2016 Trade Show, "every major bow manufacturer was present and accounted for" with over 1,100 retail and distribution companies in attendance.

54. Jay's Sporting Goods General Manager Mark Copeland stated "[t]he Trade Show is the one place where nearly everyone in our industry does business. It provides the perfect opportunity for retailers to talk face to face with Retail Council members. The retailer is in the trenches every day working to develop archers. To better our industry, we'd love to know what topics we should take to the ATA Board on your behalf."

55. MAP policies are openly and frequently discussed at ATA Trade Shows. At the 2015 ATA Trade Show, "[a]bout 60 representatives of ATA-member manufacture, distributors and retailers attended [a] meeting to review a sample MAP/MPR policy."

### 2. ATA Connect

56. Another avenue through which the ATA allowed conspirators to communicate and coordinate was its "ATA Connect" forum. Created in 2017, the members-only forum is an "online discussion community created exclusively for ATA members" and "a safe, confidential space to network and solve industry challenges through constructive discussions." ATA Connect was conceived as "the first members-only forum for archery-industry professionals to discuss hot topics among themselves – and work together to find solutions."

57. Throughout the conspiracy, ATA Connect was used by ATA to coordinate

conversation on MAP policies. In 2019, for example, the ATA updated its website to urge its members to use ATA Connect to "discuss MAP with [their] peers." The ATA has also urged its members to use ATA Connect to "find solutions that boost business and benefit the industry by tackling topics like MAP policies[.]" Further, the ATA has specifically sent its retail members to ATA Connect to discuss "topics like MAP policies" within "a safe online space."

### C. Defendants' Conspiracy

58. As set forth herein, since at least January 1, 2014, Defendants agreed, combined, or conspired to artificially raise, fix, maintain, or stabilize prices of Archery Products in the United States. To implement their unlawful contract, combination, or conspiracy, the Manufacturer and Retailer Defendants – acting through and with the aid of the ATA and co-conspirators – agreed to implement and strictly enforce MAP policies for Archery Products. The intended and realized result of this conspiracy was that prices for Archery Products were inflated to supracompetitive levels throughout the Class Period.

### 1. ATA Members Sounds the Alarm on Price Competition

59. In the years prior to the conspiracy, Defendants began to express concerns abouts price competition for Archery Products and the effect competition was having on lowering prices and diminishing profit margins on these products.

60. As early as 2011, ATA members expressed concern about profitability in the industry by discussing MAPs as a way to raise the price and profit margins on Archery Products.

61. While MAPs had existed in the Archery Product industry prior to the conspiracy, their effectiveness was muted by the fact that a critical mass of competitors needed to adhere to and enforce the MAP policies in order for those policies to have an industry-wide effect. Thus, individual manufacturers or retailers could not increase their profitability on Archery Products unless there was collective action. As a 2011 ATA briefing noted, the industry faced "limitations

that restrict individual companies from stopping price cutting by some product resellers."

62.     Throughout the early 2010s, the lack of collective action within the industry to implement and enforce MAPs resulted in relatively high price competition throughout the industry. Responding to calls from the industry for a more active role in facilitating this kind of collective action, ATA offered a lukewarm response in 2011, stating "[t]he only action the ATA has taken or intends to take [regarding MAP policies] involves providing all ATA members a chance to have a voice and weigh in on MAP, which is a highly sensitive and potentially controversial issue." Around this time, one ATA Board member stated "[t]here is nothing the ATA can legally do when it comes to enforcement. There's no rule the ATA can set down and say 'This is what you must do.'"

63.     The pressure from ATA members for the ATA to facilitate industry-wide action continued to grow. In 2014, this pressure campaign culminated in the addition of Cabela's and Bass Pro Shops to the ATA Board of Directors. From there, the ATA took the firm position that all members should institute and enforce MAP policies.

64.     ATA's new activist position on the issue of MAP following Cabela's and Bass Pro Shops' placement on the ATA Board of Directors is no mystery. With two of the largest Archery Product retailers now leading the ATA, industry participants had much greater assurance that if they adopted and enforced MAP policies, their competition would as well.

      **2.     ATA Issues Call to Action to Industry on MAP Policies and Collective Action**

65.     Memorializing the ATA's new position as facilitator of industry action on MAPs, ATA CEO Jay McAninch published a blog post on the ATA website titled "MAP: United We Stand, Divided We Fall." The post highlighted the ATA's view that industry- wide adoption and enforcement of MAP policies was the key to continued profitability, and McAninch invited other manufacturers and retailers to agree to these policies. In part, the post stated:

Unfortunately, this unprecedented interest [in archery products] has increased competition so much that some companies ignore MAP (minimum advertised price) just to make a sale. . . .

MAP has been controversial largely because it's associated with price fixing, which means setting a minimum or maximum price for selling consumer goods. . . .

I believe to deal with this MAP issue, our industry must hold an open, honest dialogue about it. ***Everyone must participate*** because if we don't address the damage to our business model, we risk losing in the long term the sustained growth we've enjoyed. Since this involves everyone the ATA is the right group to facilitate this discussion and provide the vehicle ***for the industry to unite*** behind constructive, positive changes.

To ensure the industry addresses these issues, we've engaged the ATA Board of Directors; and the leaders of [buying groups] ARRO [Archery Range and Retail Organization], NABA [National Archery Buyers Association], NBS [Nation's Best Sports] and Sports Inc. We've also included manufacturers and distributors who expressed interest in MAP. In the months ahead, we'll facilitate a dialogue that examines what our industry's business leaders think can and should be done about MAP. To that end, the ATA will offer our MAP policy as a template that companies can use as a tool if they take action.

***We can't solve industry problems until we involve everyone in a conversation that shares concerns and develops a course of action.*** This first step basically "turns on the lights" because it requires everyone to share what they think about this issue's impacts on our industry. Once we have a clear sense of what MAP is about for ATA members, we can start a process that deals with it.

66.     To support this united industry action, the ATA created a draft MAP policy for its members designed "to protect our companies from state and federal legal actions, while clearly informing other companies of their unilateral policy on product pricing." ATA also created a checklist of key considerations "for forming – and enforcing – a sound, effective MAP policy."

67.     At the January 2015 ATA Trade Show, ATA hosted a lunchtime seminar on creating and enforcing MAP policies. The seminar was attended by approximately 60 ATA members, including manufacturers, distributors and retailers. A subsequent ATA newsletter reported "[i]f ATA members want to control the minimum advertised price (MAP) and/or the minimum resale price (MRP) of their products, each business must create its own policy statement, issue it to all resellers, and then enforce it consistently and forcefully with no negotiations."

68.     ATA advised their members on how to craft "customized policies to protect each product's publicly advertised minimum price. That price is protected whether it's posted online, displayed outside on store-front signs or windows, or advertised in fliers, newspapers, magazines, TV or radio. Companies that don't set MAP/MRPs and enforce them risk profit losses as well as diminish their brand."

69.     A February 6, 2015 newsletter expanded on the MAP training given to those attendees. It noted, "[t]he ATA cannot set or enforce MAP/MRP policies for the industry because it would violate antitrust laws. However, the ATA can provide help and information so individual manufacturers can craft their own policies, which the companies must then enforce themselves." The training and newsletter also built on the sample MAP policy that ATA offered in 2014, including a "three-step plan . . . to help ATA-member manufacturers and distributors adapt a sample policy for their own use."

70.     In June of 2015, Kinsey's announced the implementation of a new MAP Policy. In a press release in *Archery Wire*, they explained, "Kinsey's stands behind manufacturers in their implementation of minimum advertised pricing to protect the interests of their brands, as well as margin integrity within the retail network."

71.     Important to the effectiveness of this MAP push was active participation of Archery Product distributors. Because many product resellers such as smaller pro shops purchase Archery Products from distributors or retailers as opposed to directly from the manufacturers, price floors established by the MAP policies would only be effective if the distributors or retailers vigilantly policed the manufacturers' MAP policies.

72.     To this end, manufacturers reached an agreement with distributors to assist in the policing of MAPs. For example, in June 2015 manufacturer TenPoint commented that "Kinsey's has done a great job of backing TenPoint's enforcement of its MAP policy, thus strengthening the

TenPoint brand as well as helping the retailers maintain a solid profit margin. This MAP enforcement is important in order to keep the retailer base, and archery as a whole, healthy."

73.     Another prime example of this kind of policing throughout the supply chain is the MAP policy enacted by T.R.U. Ball Archery Releases/Axcel Archery Sights ("T.R.U."), instituted in 2017, which provided punishments for "MAP Violators" at two levels of the supply chain. For retailers who sold T.R.U. Archery Products., the following conditions applied:

> **New MAP Violator:**
> A warning will be issued. Violator will be evaluated in approximately two weeks to determine if they have raised prices to MAP levels.
>
> **Repeat MAP Violator:**
> First repeat infraction – Violators who have been notified that they are below MAP pricing within the last six months will be given a 48 hour warning to raise prices to MAP levels. Violators who have not raised prices to MAP levels after this time period will be placed on the T.R.U., Inc. Do Not Sell List, which asks each distributor to immediately block supply of product, for 30 days
>
> **Second repeat infraction –** Violators who have been listed on the T.R.U., Inc. Do Not Sell List within the last six months who knowingly lower their prices below MAP level for a second time will be placed on the T.R.U., Inc. Do Not Sell List, which asks each distributor to immediately block supply of product, for 60 days.
>
> **Three or more repeat infractions –** Violators who have been listed on the T.R.U., Inc. Do Not Sell List within the last six months who knowingly lower their prices below MAP level for more than two times will be placed on the T.R.U., Inc. Do Not Sell List, which asks each distributor to immediately block supply of product, for the greater of 60 days or until prices have been raised to MAP levels for at least 30 days.

For distributors who sold T.R.U. Archery Products to other resellers, additional conditions applied:

> **Distributor Violators:**
> T.R.U., Inc. will be using contacts from around the United States to purchase products from sources who are known to be violating MAP levels.
>
> **First infraction –** Distributors who are found to supply a company that is currently on the T.R.U., Inc. Do Not Sell List will be added to the T.R.U., Inc. Do Not Sell List for 30 days.
>
> **Second infraction –** Distributors who are found to supply a company that is

currently on the T.R.U., Inc. Do Not Sell List will be added to the T.R.U., Inc. Do Not Sell List for 60 days.

**Third infraction –** Distributors who are found to supply a company that is currently on the T.R.U., Inc. Do Not Sell List will be added to the T.R.U., Inc. Do Not Sell List indefinitely.

74.     In a June 23, 2015 post on industry forum *Archery Talk*, one retailer remarked "My hope is that the ATA association [sic] is successful in establishing ***an industry wide rule set that will be enforced industry wide.***"

### 3.     Into 2016 Defendants Push for Continued Enforcement of MAP Policies

75.     Into 2016, the ATA reflected on the impact of the ATA's push for industry-wide action on MAP policies, "More than one year later, there's still good news and bad. However, the ATA and its member companies have worked tirelessly to discuss, craft and enforce MAP policies that could help manufacturers, retailers and the industry."

76.     That article quoted several industry participants, beginning with Mike Ellig, founder of Archery Products manufacturer Black Gold Inc:

I was ready to charge ahead, but as a small-business owner, I didn't know where to start and I didn't have two months to create a policy from scratch. Jay [McAninch] connected me with the ATA's lawyers and provided resources I wouldn't have found otherwise out here in Bozeman, Montana.

Black Gold's MAP policy has been in place about two years. Ellig said he notices more companies adhering to the MAP policy, and also has "cut off" people who wouldn't abide by it.

77.     Ellig also noted that collective action on MAP policies would benefit the industry as a whole through higher prices, even if it meant that individual manufacturers or retailers sacrificed profits in the short term. The ATA article reported: "Enforcing MAP is up to every individual company," Ellig said. "It's a lot of extra effort. A lot of people will decide it's not worth the hassle because it's so much work. Some won't take time to do it, but ***the long-term impact of doing it right is 10 times greater than the short-term impact of getting a sale for the archery***

*industry*."

78.     One Archery Products retailer and member of buying group ARRO stated "[w]e have to educate our dealers about holding to the MAP as much as they can . . . [o]therwise (violators will) destroy the brick-and-mortar stores." This same retailer noted two "MAP Issues", (1) "Many sellers dodge MAP by selling a product and offering a $50 coupon or gift card. They sell the product so low that other retailers can't compete;" and (2) "Some manufacturers take the time and trouble to create MAP policies, only to find they can't enforce them."

79.     The Defendants were once again clear about the central role the ATA would play in the ability to implement and enforce MAP policies across the industry. One retailer concluded, "It will take the ATA's power to educate retailers and manufacturers about the importance of upholding MAP policies."

80.     In a similar sentiment, Lancaster's Bruce Hudallah stated "MAP is a good thing for the archery industry It keeps a level playing field and allows people to compete on product knowledge and customer service." Hudallah continued, "ATA has done an excellent job getting all the main players from retailers to manufacturers to sales reps in the same room and presenting the facts and sample policies," and that "[i]f you have a [MAP] policy, it must be enforced."

81.     Ben Summers, director of operations at T.R.U. and vice chairman of the ATA Board of Directors discussed MAP policies from the perspective of a "large manufacturer." Chief among his concerns was that, without active enforcement, competitors would "cheat" on the agreement and steal sales by offering a better price. Summers stated "[i]f I'm really good at keeping my products at the MAP price, and I have a competitor who isn't keeping a MAP policy, and their product costs less than mine, I can lose lots of sales." But Summers noted that the ATA played the critical role of enforcer:

> Jay McAninch always talks about **shining light in dark corners so people can be seen for what they're doing, and be held accountable**…

ATA's lawyers have shone that light by offering information on how to structure a MAP policy, providing examples of policies from other industries, and explaining different tactics some companies use.

82.     Jay Scholes, co-founder of marketing firm Outtech, stated "we're responsible for upholding our sport, for making sure our retailers make money, and ensuring manufacturers also make money. MAP is a good thing for our industry." He concluded, "If we all believe we're in this business because we love the outdoors, we have a responsibility to uphold MAP to strengthen the industry."

83.     At the 2016 ATA Trade Show, attendees discussed the need for industry unity on implementation and enforcement of MAPs. For example, the President of an archery retailer group presented at the Trade Show on MAP policies, remarking that "many dealers might not know how to price certain products, but MAP helps them learn what profit margin they need to make their business survive," and "We have to educate our dealers about holding to the MAP as much as they can . . . [o]therwise [violators will] destroy the brick-and-mortar stores." One attendee further remarked, "[t]he archery industry is uniting as one, understanding we are all in this together, and that *unity is ultimately what will help us grow*."

84.     Shortly after this Trade Show, the ATA published an article that directed "Members Interested in MAP Policies" to contact the ATA "for resources about creating a MAP policy for [their] company."

85.     In May 2016, the ATA Retail Council met for a "strategic-planning" meeting in Minneapolis, Minnesota, which included nearly 40 ATA Retail Council members. Among the leaders of the Retail Council at this summit was the Council Chairman, Jay's Sporting Goods General Manager Mark Copeland.

86.     In an August 30, 2016 article in *Inside Archery*, ATA President Jay McAninch stated about this summit that "It's clear from our strategic planning meeting that our industry

understands that its success depends largely on the success of archery and bowhunting retailers. The ATA's Retail Council is rejuvenated, highly engaged and ready to help forge a better future for everyone in our industry."

87.    In July 2017, the ATA Board of Directors met at the headquarters of Hoyt and voted unanimously to add two seats to the Board, adding representatives from Archery Products buying groups the National Archery Buyers' Association ("NABA") and the Archery Range and Retailers Organization ("ARRO"). With those additions, the ATA Board of Directors in 2017 consisted of "three pro shops, two buying groups, one sales representative, two multi-channel retailers, and 12 archery and bowhunting manufacturers and distributors." ARRO's executive secretary said of recent ATA efforts, "ATA has been a force in growing archery and bowhunting in recent years . . . . It's been working to help retailers be more profitable." She also expressed her hope that the Board appointment strengthens the relationship and communication between ARRO, ATA and manufacturers."

88.    Following that meeting, the ATA published an article entitled "MAP: What is it? Why Does it Exist?" The article continued the push for members to adopt, implement, and enforce MAPs and encouraged retailer members to also push for their implementation. The article explained, "MAP policies that level the playing field for all retailers, and eliminate the "race to the bottom" that would occur if retailers endlessly competed to reduce prices. The policies also help manufacturers protect their integrity, maintain their worth and stabilize their brand." The article again highlighted ATA's central role in the conspiracy:

> The Archery Trade Association's Board of Directors and its Retail Council to members are discussing how to solve those problems and ensure the longevity of brick-and-mortar retailers, who form the industry's core. ATA members regularly weigh in on MAP, and the conversation continues. While the ATA works with manufacturers to establish and enforce good MAP policies, you can get involved in several ways.

89.    ATA provided a list of action items for members to take to address the industry

concern with price competition. First, the ATA encouraged members to "[s]tart by following good MAP policies," followed by "If a manufacturer doesn't have a policy, or doesn't enforce its policy, call the company and express your concerns. Encourage them to work with the ATA to develop a MAP policy or improve their current policy."

90.     The article made the views of the ATA clear, stating "Ryan Shutts, Cabela's merchandising director and an ATA Retail Council member, thinks manufacturers should create MAP policies, and retailers should honor them," and "Shutts said every business in the industry must work together as a group to be productive and profitable, which includes strong MAP policies and procedures."

91.     Finally, the article emphasized the outsized profits that the industry could realize, in the form of higher prices to consumers, by acting collectively to institute and enforce MAP policies, "If you follow MAP and work within that price structure . . . [t]hat puts you in a better position financially than cutting the cost of a product and disobeying MAP policies, which can have big consequences;" and, "*When you're part of the solution, you'll make more money*."

### 4.     ATA Introduces Additional Resources, Including Services from the Software Co-Conspirators, to Facilitate the Conspiracy

92.     In October 2017, ATA expanded its MAP-related offerings by launching a "MAP Resource Library" exclusively for ATA Members. The ATA press release announcing this new resource stated:

> *ATA staff are compiling manufacturers' MAP policies and posting them in the Members-Only area of the ATA website*. This MAP Resources Library helps retailers learn which manufacturers have MAP policies, and helps retailers to understand and comply with them. Several policies are already posted, and the ATA will add more as manufacturers provide them.
>
> *If you're a manufacturer and need help monitoring how well retailers adhere to your MAP policy, the ATA can help you, too*. MAP policies are only effective if they're enforced, but monitoring and enforcing them can be challenging. To help, ATA has secured special discounts with firms that monitor and enforce MAP policies. These discounts are available only to ATA-member manufacturers.

The ATA has asked all ATA-member manufacturers to provide their policies so they can be included in the MAP Resource Library. If your company has a MAP policy, or if you have questions, contact Wendy Lang, ATA membership manager, at wendylang@archerytrade.org. To capitalize on these ATA-member benefits, join the Archery Trade Association today.

93.     In effect, the ATA was creating a centralized repository for the MAP policies of all ATA members. Through this, it was clear that competitors were functionally agreeing not to compete with one another on price for Archery Products. In a truly competitive market, true competitors could not institute price floors on their products because they could not be certain that their competitors would not undercut their prices and steal business. But by compiling and publishing the MAP policies of all ATA members, the ATA essentially created a list of competitors who have agreed not to undercut each other on price.

94.     In 2017, the ATA introduced and recommended to members the usage of co-conspirators TrackStreet and Oris. The ATA offered a special discount to members to use these firms. ATA described TrackStreet and Oris as providing "'web crawlers' and other high-tech software to scour the internet for MAP violators." It further described that the Software Co-Conspirators "know how to find out who's violating [MAP], identify their fictitious names, and track them as they move around to undercut our members." Both of these programs featured digital platforms that enable users to track and enforce pricing policies, including MAP policies. In a since-deleted image hosted on the ATA website, Oris advertised "Actionable insights that preserve pricing integrity – from the outdoor industry to housewares, and everything in between, ORIS helps manufacturers protect their brands."

95.     In the ATA website, ATA notified manufacturer members, "MAP policies are only effective if they're enforced, but monitoring and enforcing them can be challenging. To help, ATA has secured special discounts with firms that monitor and enforce MAP policies. These discounts are available only to ATA-member manufacturers."

96.     The price for these services without any discount can exceed $1,000 per month. Archery Products manufacturers, retailers, or other industry participants would have no reason to pay for such expensive services if Oris and TrackStreet did not help those participants become more profitable - here, by helping raise the price of Archery Products and by punishing participants who tried to undercut on price.

97.     Oris and TrackStreet were aware of and profited from their role in the conspiracy and accordingly share the antitrust liability with the other Defendants.

98.     Near the same time as the MAP Resource Library, ATA created another new page on its website dedicated to MAPs. The since deleted webpage described how a MAP policy "ensures all retailers compete fairly and evenly on service instead of price." It further argued that "[r]etailers are responsible for knowing MAP policies and adhering to them."

99.     In November 2017, as mentioned herein, ATA released ATA Connect, which was described as "a new online discussion community created exclusively for ATA members. It's a safe, confidential space to network and solve industry challenges through constructive discussions." In an ATA article announcing the release, the ATA stated "[u]sing ATA Connect, work with your peers to find solutions that boost business and benefit the industry by tackling topics like MAP policies, buying patterns, and setting appropriate charges for service work."

100.    In 2019, ATA noted that "[t]he hottest current topic on ATA Connect is managing inventory as new compound bows hit the market. Retailers are also discussing ways to communicate with suppliers to ensure positive, profitable partnerships."

101.    ATA created a channel for ATA-member retailers called ATA Connect's Retail Growth Interact. The channel was "exclusive to ATA-member retailers, which ensures it's productive and solutions-focused." The purpose of this channel was described as:

> Retail Growth Interact is a great place to share ideas and ask questions about the topics that matter most to your business, including buying patters [sic], profit margins and what to

charge for services. Together we can address industry challenges, boost your bottom line, and promote archery and bowhunting.

102.    Shortly after, ATA announced that it was releasing another members-only channel, My ATA Network, described by ATA as:

> Distributors, manufacturers, retailers and other ATA members have different business goals, objectives and operations. That's why the ATA is creating My ATA Network, an open forum that helps all ATA members work together to grow archery and bowhunting participation while boosting their businesses.

103.    Besides encouraging industry participants to exchange information covertly through ATA connect, in 2018, Retail Council Members "agreed they must encourage more retailers to share profitable tips and strategies for sales and marketing," including by soliciting and sharing competitive sensitive information directly with competitors. One Retail Council member stated "[t]his isn't about retailers fighting with manufacturers and telling them how to do their jobs; it's about sharing ideas that help retailers and manufacturers succeed." Another Retail Council Member put a finer point on it: "We want retailers to chime in with ideas on what works at their stores, what doesn't, and why." Common questions asked included, "[h]ow much do you charge for labor? What's selling this year in your area? Are the same products selling in Pennsylvania, California and Michigan? They can help each other a lot."

104.    Throughout the conspiracy, the ATA had introduced, and the manufacturer and retail Defendants had adopted, a series of channels and methods with the stated purpose of them being used to discuss MAPs and similar pricing strategies. This would only escalate into the later years of the conspiracy.

### 5.    Defendants Continue to Stress MAP Enforcement as their Practices Result in Higher Prices and Profit Margins

105.    By at least 2019, Defendants began to openly communicate how they had achieved the critical mass of industry participation that made their MAP policies effective at artificially raising prices. In a 2019 ATA article, T.R.U.'s Ben Summers stated that "good MAP policies and

relentless enforcement played a big part in the company's 'really high' sales the past year."

106. ATA stressed the need for continued policing of MAPs and punishment of retailers or distributors who attempted to "cheat" the conspiracy and undercut prices. ATA's Director of Industry Relations, Kurt Smith, highlighted the need for competitors to work together in order for the MAP policies to have the desired effect of raising prices. He stated "[t]he big thing will always be communication and teamwork," because "[e]nforcing MAP will never get easier. That's why it's so important for ATA members to work together as much as possible."

107. On March 20, 2019, Smith hosted TrackStreet's Ryan Erickson on the official ATA podcast *Beyond the Bow* on an episode titled "MAP Policies and Enforcement." Erikson stressed the importance of having a critical mass of manufacturers to adopt, implement, and enforce MAP policies, explaining "nobody wants to be the first soldier through the way . . . they tend not to turn out too well. . . *[but] as soon as a couple of big brands hop on, then all of a sudden that provides an umbrella coverage for the rest of the brands to move forward.*"

108. In 2019, Kinsey's described their MAP policy as "When someone breaks the rules, they lose the ability to buy that product from us. They also can't buy it online or through the manufacturer because we work closely with our vendors to build a 'do-not-sell' list." Kinsey's also explained that "[i]f your company has fallen below MAP prices, you will be restricted from purchasing these products from Kinsey's South effective immediately."

109. Defendants continued to use interviews with trade publications to signal to their co-conspirators their commitment to the cause of raising prices through MAPs.

110. For example, an August 2019 edition of *Inside Archery* featured a front page story titled "Kinsey's: Branching Out, But True to Its Roots," which discussed MAP policies and quoted Kinsey's executives reaffirming their commitment to industry-wide enforcement. "We work closely with our vendor partners and retail partners to monitor and enforce MAP policy," [Kinsey's

CEO] Justin Gorman said. "There are a lot of methods out there, and there really is no simple solution, but by working together, we have the ability to bring positive change to the industry." The same article advertised the continuing need for collective action for the MAP policies to have the intended effect. It quoted Justin Gorman saying, "Everyone needs to pull their own weight, but we are doing all we can to help protect the honest shops that don't violate MAP, which are the shops that actually get hurt when someone else breaks the rules."

111. Similar stories in industry publications such as *Inside Archery* continued to serve as a means for Defendants to reaffirm their commitment to the conspiracy and signal their assurances to competitors that if they too joined the conspiracy, they would not be risking another firm undercutting them on price – a risk that is evergreen in a competitive market. In March 2020, for example, PSE General Manager David Kronengold was quoted saying "[t]he industry is in a hard place, but we are not going to wait for anyone else to fix it for us. We are going to make it part of PSE's business strategy to drive improvement and fix everything we can. And we are doing all of this while fully acknowledging that if we are successful, then we are also benefiting our competitors."

112. The December 2020 edition of the same publication quoted Phaen Pittman, the Manager of retailer Performance Archery, as stating "the purchasing side is where we put a major emphasis on who we do business with and why … we're constantly researching to find the best products, backed by companies with strong MAP policies and good dealer margins."

113. An industry sales consultant firm MWS Associates, Inc. was quoted in an ATA website article stating:

> We're all competitors, and we compete against each other throughout the season and the years. But we must grow the numbers in the industry, and to do that we must work together  Realistically, the ATA does so much for the growth and health of the industry, and I think that largely goes unrecognized. Although we're all competitors in the industry, we all have the same goal, and that's to help the industry succeed. The ATA works on that, and reminds us to see the bigger picture.

114.    The ATA continues to maintain its webpages discussing MAP and offering the myriad resources to facilitate the conspiracy among the other Defendants.

### 6.    Defendants' Conspiracy Continues Through the Present

115.    Into the past few years and to today, Defendants have continued to use and expand their well-practiced channels to communicate their continued commitment to the conspiracy. They have also expanded their collection and distribution of sensitive competitor information.

116.    In 2022, ATA announced the release of the new ATA Retail Business Tracker Survey, which was described by the ATA as follows:

> As an archery business, data and reliable facts play a pivotal role in making critical decisions. To address that need, the ATA is launching a new quarterly survey to gain insight from retailers across the country to help members adapt to changing conditions regionally as well as to compare your business to what is happening nationally.

117.    In a subsequent article on the ATA website, the organization explained the process and aims of the survey:

> The ATA puts together a Retail Trend Tracker survey each quarter and sends the questionnaire to retail members in order to curate relevant and informative data about the state of the industry according to the retail shops' experience. The ATA then shares the data gathered from the survey with distributors, manufacturers and retailers in an easily digestible report. The data is provided collectively for each region.

118.    The article, further explained the intended usage of the report, that "[s]ince each region of the country is represented in the report, retailers and manufacturers can study any discrepancies in the results and adjust accordingly, based on the data in their region."

119.    Another ATA article, titled "Download the Latest ATA Retail Trend Tracker Survey for Valuable Data about Market Trends," provides insight into the granularity of the information provided in these surveys, which includes, *inter alia*,

- the percentage of merchandise sales by product category, types of bows, price

ranges of bows, customer experience level, and foot traffic;

- seasonal questions regarding what's trending and what's not, business challenges and what customers are saying;

- which price range customers are gravitating toward, as well as the percentage of sales of each product type; bows, arrows, accessories, and services such as coaching or bow technician work.

120. For manufacturers and retailers, ATA advertises "[they] can also get a sense of how much inventory they should have on hand. Comparing your inventory with that of other shops in your region can help you determine whether what you have is working or give you a sense of how you might increase or decrease it."

121. Up until some point in 2024, the ATA Retail Business Tracker Survey was available exclusively for ATA members. As described, membership is only available to industry participants such as retailers, manufacturers, and distributors, and explicitly excludes consumers. To become a member, applicants are required to submit several forms of identification demonstrating their bona fides as an industry participant. Accordingly, for much of its existence, the ATA Retail Business Tracker Survey was compiled from information gathered from the ATA about its members and distributed exclusively to competing retailers, manufacturers, and distributors. Until recently, these reports were made available only to competing retailers, manufacturers, and distributors and completely unavailable to consumers. Courts have commented on the anticompetitive effects of private information exchange between competitors.

122. The ATA is transparent about how it intends its members to use the information gathered from member surveys, such as that contained in the Retail Business Tracker Survey. For example, in a similar report gathered from data compiled from ATA Retail Council Member surveys and distributed at the ATA Trade Show on the prices that ATA members charged for

repairs and servicing of Archey Products, the ATA advertised "compare your service and labor rates to industry averages so you can see how you stack up against your peers." An accompanying article demonstrated how this is precisely how members used this data. Asked "[w]hat do you charge for your services," one retailer replied "Not enough. I was happy to see the bow-tech price comparison chart at the ATA show this year, and have intended to analyze what we charge and restructure it." The article concluded by signaling to ATA members, "Don't sell yourself short. If you provide quality service on time, price the work accordingly."

123. This kind of information exchange is precisely the kind of conduct that the FTC has cautioned against. In their guidance titled "Spotlight on Trade Associations" the FTC wrote:

> [E]mployees should be careful when sharing information they could not otherwise share with competitors through intermediaries such as a financial analyst or even a supplier if the consultant were to share that specific information with the company's competitors, resulting in a change in their pricing strategy, such indirect communications could be seen as facilitating an agreement if other evidence points to a coordinated strategy.[2]

124. The "Guidelines for Collaborations Among Competitors" issued in 2000 by the United States Department of Justice ("DOJ") and the Federal Trade Commission ("FTC") provide:

> Agreements that facilitate collusion sometimes involve the exchange or disclosure of information…. [I]n some cases, the sharing of information related to a market in which the collaboration operates or in which the participants are actual or potential competitors may increase the likelihood of collusion on matters such as price, output, or other competitively sensitive variables. The competitive concern depends on the nature of the information shared. Other things being equal, the sharing of information relating to price, output, costs, or strategic planning is more likely to raise competitive concern than the sharing of information relating to less competitively sensitive variables.[3]

---

[2] Spotlight on Trade Associations, Federal Trade Commission, available at https://www.ftc.gov/advice-guidance/competition-guidance/guide-antitrust- laws/dealings-competitors/spotlight-trade-associations (last accessed June 24, 2025).

[3] Roundtable on Joint Ventures, Note by the US Federal Trade Commission and the US Department of Justice, 15–16 (Oct. 9, 2000), https://www.ftc.gov/system/files/attachments/us-submissions-oecd-other-international- competition-fora-2000-2009/2000-rdtble_on_joint_ventures_ftc_doj.pdf.

125.    A decade later, in 2010, the United States submitted the following comments to the Organization for Economic Cooperation and Development on the legal approach to information sharing among competitors:

> [C]ertain information exchanges among competitors may violate Section 1 of the Sherman Act, which prohibits a "contract, combination … or conspiracy" that unreasonably restrains trade. The antitrust concern is that information exchanges may facilitate anticompetitive harm by advancing competing sellers' ability either to collude or to tacitly coordinate in a manner that lessens competition. Thus, for example, exchanges on price may lead to illegal price coordination.[4]

126.    Four years later, in 2014, the FTC issued general guidance entitled "Information exchange: be reasonable," confirming that "when competing companies seek market intelligence by exchanging price or other commercially sensitive information, that may facilitate collusion or otherwise harm competition and consumers in violation of the antitrust laws."[5]

127.    Throughout the conspiracy, the ATA has served as the centerpiece of Defendants' efforts to coordinate in order to fix, raise, and maintain artificially high prices for Archery Products. To this end, the ATA created, and promoted, open channels of communication between competitors, including ATA Trade Shows, ATA Connect, ATA Retail Business Tracker, and other forms of communication described herein have been vehicles through which Defendants routinely exchanged competitively-sensitive information with the intention and effect of thwarting price competition and increasing profit margins industry-wide.

128.    This conspiracy to artificially raise prices through the adoption, implementation, and enforcement of industry-wide MAP policies, and ATA's efforts to facilitate it, continues to the present. Additionally, the effects from this price-fixing agreement are still being born by

---

[4] OECD, Information Exchanges Between Competitors under Competition Law 294 (2010), https://www.academia.edu/79222152/Information_Exchanges_Between_Competitors_under_Competition_Law (last visited April 13, 2024).
[5] Micheal Bloom, Information exchange: be reasonable, FTC (Dec. 11, 2014), https://www.ftc.gov/enforcement/competition-matters/2014/12/information-exchange- be-reasonable (last visited June 24, 2025).

Archery Products consumers today.

**D. Defendants' Conduct Had the Intended Anticompetitive Effects**

129. Defendants' agreement to artificially raise, fix, maintain, or stabilize prices for Archery Products and to exchange competitively sensitive information regarding Archery Products has had the intended effect of artificially inflating the prices for Archery Products paid by consumers.

130. Defendants' horizontal agreement between competitors to raise prices through the implementation and enforcement of MAP policies in fact raised prices through two mechanisms. First, MAP policies, when adhered to by a critical mass of horizontal competitors, eliminate the ability of competitors to attract customers by publicly advertising lower prices. Whether or not a retailer may actually offer a lower price by means such as a coupon or a "shopping cart" discount, MAPs prohibit them from advertising that lower price – thus, there is no incentive for competitors to lower prices when there is little chance for that lower price to be recouped by higher sales volume. Second, even if some retailers do offer discounts on the MAP prices, the industry-wide adoption of one price set unilaterally by the manufacturer operates to artificially inflate the "starting point" price from which any such discounts are calculated. In other words, the price of an Archery Product that is discounted from the MAP is still likely higher than the competitive price for that Product by operation of Defendants' conspiracy.

131. The ATA acknowledges that MAPs restrict true competition and affect retail prices paid by consumers. "MAP policies that level the playing field for all retailers, and eliminate the 'race to the bottom' that would occur if retailers endlessly competed to reduce prices." ATA also stated that MAP policy "ensures all retailers compete fairly and evenly on service *instead of price*."

132. Defendants' agreement to raise prices on Archery Products has had the intended effect, as ATA members have admitted. For example, NABA – who has had seats on the ATA

34

Board of Directors – stated its members "stive for a minimum of 40% profit based on manufacturer's M.A.P[.]" Another retailer recognized the effect of these *de facto* price floors on competition: "Most archery shops are in areas where bow pricing is highly competitive from shop to shop. We all want to get the sale, but fortunately manufacturers set MAP pricing on bows, which mostly prevents one shop from grossly undercutting another on pricing. ***That way, we all get our piece of the pie***."

133. A 2017 issue of *Field & Stream* Magazine reported on consumer attitudes towards bow prices, reporting that customers believed that the prices for compound bows were "obscene," "insane," and "out of touch," and quoted one retailer saying, "Guys around here can't afford new bows anymore." "The least expensive of our top 12 bows last year listed at $949. The priciest was $1,500. Add in arrows and accessories, and you're looking at $1,200 to $2K."

134. As shown herein, Defendants' information exchange also had the likely effect of harming competition in the Archery Products market.

135. There is a single market for Archery Products. As alleged, the MAP policies created and enforced by Defendants applied to all categories of Archery Products. The Defendants have substantial market power in the market for Archery Products. Moreover, the Manufacturer Defendants also consistently held seats on the ATA Board of Directors and ATA Retail Council throughout the Class Period, which increased their influence on the market for Archery Products.

136. Similarly, Retailer Defendants are some of the largest sellers of Archery Products in the country. These Retailer Defendants also consistently held seats on the ATA Board of Directors and ATA Retail Council throughout the Class Period, which increased their influence on the market for Archery Products.

137. The Retailer Defendants are competing for sales of identical products. Therefore, the only way the Retailer Defendants compete for those customers is through price, which is precisely

the competition that Defendants sought to suppress through their conspiracy. As Defendants themselves acknowledged, "MAP policies level the playing field for all retailers, and eliminate the 'race to the bottom' that would occur if retailers endlessly competed to reduce prices."

138.    ATA announced the stated purpose of ATA Connect, for example, to "work with your peers to find solutions that boost business and benefit the industry by tackling topics like MAP policies, buying patterns, and setting appropriate charges for service work." The ATA advertised its Retail Growth Interact channel as a great place to share ideas and ask questions about "the topics that matter most to your business, including buying patters [sic], profit margins and what to charge for services. Together we can address industry challenges, boost your bottom line, and promote archery and bowhunting."

139.    Through these channels, the ATA was able to work with the other Defendants to collect and disseminate, through multiple channels, sensitive information that would not have been available to Defendants without the existence of the conspiracy. Without this, and similar, sensitive competitive information, the Defendants would not have had the basis and confidence to implement and enforce their MAP policies on Archery Products. Policies that, through their universal adoption, allowed for this conspiracy to have its ultimate and intended effect, to artificially raise, fix, and maintain the prices consumers were forced to pay for Archery Products in the United States above levels that would have existed without the existence of the conspiracy.

## V.    ANTITRUST INJURY & DAMAGES

140.    Defendants' anticompetitive conduct has had the following effects, among others:

a)      Price competition in the Archery Products has been restrained or eliminated;

b)      Prices for Archery Products sold by the Manufacturer and Retailer Defendants and their divisions, subsidiaries, affiliates, or co-conspirators, in turn, have been raised, fixed, maintained, or stabilized at artificially high, noncompetitive levels

throughout the United States;

c)      purchasers of Archery Products have been deprived of free and open competition; and

d)      purchasers of Archery Products have paid artificially inflated prices.

141.    The purpose of Defendants' and their co-conspirators' conduct is to raise, fix, maintain, or stabilize the price of Archery Products and, as a direct and foreseeable result, Plaintiff and the class have paid supracompetitive prices for Archery Products during the Class Period.

142.    By reason of the alleged violations of the antitrust laws, Plaintiff and Class Members have sustained injury to their businesses or property, having paid higher prices for Archery Products than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and as a result, they have suffered damages.

143.    This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## VI.      CLASS ACTION ALLEGATIONS

144.    Plaintiff brings this action on behalf of themselves and as a class action under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), seeking equitable and injunctive relief, and other relief pursuant to federal antitrust laws, on behalf of the following class:

> All persons and entities who purchased Archery Products directly from any of the Manufacturer or Retailer Defendants or any of their co-conspirators in the United States at any time from January 1, 2014 until the present (the "Class Period").

> Specifically excluded from this Class are Defendants; their officers, directors, or employees; any entity in which a Defendant has a controlling interest; any affiliate, legal representative, heir, or assign of a Defendant; any federal, state, or local governmental entities; any judicial officers presiding over this action and members of their immediate family and staff; and any juror assigned to this action.

145.    Plaintiff reserves the right to amend this Class definition, including, and without limitation, the Class Period.

146. The above-defined Class Members are readily identifiable from information and records in the possession of Defendants.

147. While Plaintiff does not know the exact number of Class Members because such information is presently in the exclusive control of the Defendants. Plaintiff believes that due to the nature of the trade and commerce involved, there are thousands of Class Members geographically dispersed throughout the United States, such that joinder of all Class Members would be impracticable.

148. Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff purchased Archery Products directly from one or more of the Manufacturer or Retailer Defendants and were damaged by the same common course of wrongful conduct.

149. Common questions of law and fact exist as to all members of the Class, which predominate over any questions affecting only individual Class Members. Such questions of law and fact common to the Class include, but are not limited to:

    a.    Whether Defendants and their co-conspirators engaged in a contract, combination, or conspiracy to raise, fix, maintain, or stabilize prices of Archery Products sold in the United States in violation of federal antitrust laws;

    b.    Whether Defendants agreed to unreasonably restrain trade in violation of federal antitrust laws;

    c.    Whether Defendants and their co-conspirators participated in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements that they reached;

    d.    The identity of the participants of the alleged conspiracy;

    e.    The scope and duration of the alleged conspiracy;

    f.    The acts performed by Defendants and their co-conspirators in furtherance of the

alleged conspiracy;

g.     The effect of Defendants' alleged conspiracy on the prices Archery Products were sold in the United States during the Class Period;

h.     Whether the conduct of Defendants and their co-conspirators caused injury to the business or property of Plaintiff and other members of the Class;

i.     Whether Plaintiff and other members of the Class are entitled to, among other things, injunctive relief and if so, the nature and extent of such injunctive relief;

j.     The appropriate class-wide measure of damages; and

k.     Whether the statute of limitations was tolled or whether Defendants fraudulently concealed the existence of their anticompetitive conduct from Plaintiff and the Class.

150.   Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all members of the Class are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for Archery Products. Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class.

151.   Plaintiff will fairly and adequately protect the interests of the Class in that Plaintiff's interests are aligned with, and not antagonistic to, those of other members of the Class and Plaintiff has retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent itself and the Class.

152.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all members of the Class is impractical and Class Members do not have interests in individually controlling the prosecution of separate actions. Prosecution as a class action will eliminate the possibility of duplicative litigation. The damages suffered by individual members of the Class compared to the expense and burden of

individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for members of the Class to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and the establishment of incompatible standards of conduct for Defendants and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economies of scale, and comprehensive supervision by a single court.

153.    Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

## VII.    FRAUDULENT CONCEALMENT & EQUITABLE TOLLING

154.    Any applicable statute of limitations has been tolled by Defendants' knowing and active concealment of the unlawful conduct.

155.    Plaintiff and Class Members had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiff and Class Members did not discover and could not have discovered through the exercise of reasonable diligence the existence of the conspiracy alleged herein until shortly before filing this Complaint. Defendants engaged in a secret conspiracy that did not reveal facts that would put Plaintiff or Class Members on inquiry notice that there was a conspiracy to fix prices for Archery Products.

156.    The contract, combination, or conspiracy alleged herein was fraudulently concealed by Defendants throughout the Class Period by various means and methods, including, but not limited to secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings to prevent the existence of written records, limitation of any explicit reference to competitor pricing, communications on documents, communication of competitively sensitive data to one another through the members-only ATA-created channels

detailed herein, which kept both the content and identity of participants in the system secret, and the concealment of the existence and nature of their competitor price discussions from non-conspirators.

157. Further, the very nature of Defendants' conspiracy was concealed by Defendants through their usage of the term "MAP" to describe what was effectively a horizontal agreement to fix prices.

158. Defendants also conducted the conspiracy through the ATA, which is members-only and whose Board of Directors and Retail Council meetings are closed even to most members.

159. Similarly, many of the references to the ATA's facilitation of the conspiracy were removed from their website around 2021 and, without further context, would have been insufficient to put consumers on notice of Defendants' conspiratorial actions.

160. By virtue of the fraudulent concealment of their wrongful conduct by Defendants and their co-conspirators, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiff and Class Members have as a result of the unlawful contract, combination, or conspiracy alleged in this complaint.

## VIII. CONTINUING VIOLATION

161. A continuing violation restarts the statute of limitations period each time Defendants commit an overt act.

162. During the Class Period, Defendants continued to make sales to Plaintiff and Class Members of Archery Products whose prices were fixed as a result of Defendants' continually renewed and adjusted price-fixing and information exchange agreement. Defendants needed to continually renew and adjust their price fixing and information exchange agreement to account for ever-fluctuating economic and market conditions.

163. Defendants' meetings and misrepresentations were overt acts that began a new

statute of limitations because these events advanced the objectives of Defendants' conspiracy.

164.    Defendants' overt acts, which were new acts beyond the initial price fixing that were necessary to perpetuate Defendants' agreement, continued throughout the Class Period. Each sale of Archery Products by a Defendant at a supracompetitive price was a new overt act that was part of Defendants' antitrust violations that injured Plaintiff and Class Members and started the statutory period running again.

165.    Defendants' overt acts were new and independent acts that perpetuated their agreement and kept them current with market conditions. They were not merely reaffirmations of Defendants' previous acts. By constantly renewing and refining their agreement to reflect market conditions, Defendants inflicted new and accumulating injury on Plaintiff and Class Members.

166.    Further, each purchase by Plaintiff and Class Members through the Class Period of Defendants' Archery Products, the price which resulted from Defendants' continually renewed and adjusted price-fixing agreement, necessarily caused new and accumulating injury to Plaintiff and class members.

167.    As the concept of a continuing violation applies to a price-fixing conspiracy that brings about a series of unlawfully high-priced sales over a period of years, each sale to Plaintiff and Class Members starts the statutory period running again regardless of Plaintiff's knowledge of the alleged illegality at much earlier times. This means that each illegally priced sale of Archery Products to Plaintiff and Class Members constituted a new cause of action for purposes of the statute of limitations.

IX.    CAUSES OF ACTION

### COUNT 1
### Violation of Sections 1 and 3 of the Sherman Act Section 4 and 16 of the Clayton Act
### Conspiracy in Restraint of Trade
### (15 U.S.C. §§ 1, 3, 15(a), 26)

168.    Plaintiff incorporates and realleges, as fully set forth herein, each and every

allegation set forth in the preceding paragraphs of this Complaint.

169. At least as early as January 1, 2014, and continuing through the present, the exact dates being unknown to Plaintiff, Defendants and their co-conspirators entered into an unlawful and continuing contract, combination, or conspiracy in unreasonable restraint of trade to artificially raise, fix, maintain, or stabilize prices for Archery Products in the United States to supracompetitive levels, in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

170. This conduct is unlawful under the *per se* standard. Defendants' conduct is also unlawful under a rule of reason analysis because the agreement is factually anticompetitive with no valid procompetitive justification. Moreover, even if there were valid procompetitive justifications, such justifications would have been reasonably achieved through less restrictive means of competition.

171. The contract, combination, or conspiracy alleged herein has had the following effects, among others:

A. Price competition in the sale of Archery Products has been restrained, suppressed, and/or eliminated in the United States;

B. Prices for Archery Products sold by the Manufacturer or Retailer Defendants have been raised, fixed, maintained, or stabilized at artificially high, non-competitive levels throughout the United States; and

C. Those who purchased Archery Products directly from the Manufacturer or Retailer Defendants or their co-conspirators have been deprived of the benefits of free and open competition.

172. Plaintiff and Class Members have been injured and will continue to be injured by paying artificially inflated prices for Archery Products purchased directly from the Manufacturer or Retailer Defendants or their co-conspirators than they would have paid and will pay in the

43

absence of the contract, combination, or conspiracy.

173.    Plaintiff and Class Members seek three times their damages caused by Defendant's violations of Section 1 of the Sherman Act, the costs of bringing suit, reasonable attorneys' fees, and a permanent injunction enjoining Defendant from ever again entering into similar agreements in violation of Section 1 of the Sherman Act.

**COUNT 2**
**Violation of Section 1 of the Sherman Act**
**Exchange of Competitively Sensitive Information**
**(15 U.S.C. § 1)**

174.    Plaintiff incorporates and realleges, as fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

175.    At least as early as January 1, 2014, and continuing through the present, the exact dates being unknown to Plaintiff, Defendants and their co-conspirators entered into an unlawful and continuing contract, combination, or conspiracy in unreasonable restraint of trade to artificially raise, fix, maintain, or stabilize prices for Archery Products in the United States to supracompetitive levels, in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

176.    In furtherance of this scheme, Defendants and co-conspirators have agreed between and among themselves to exchange competitively sensitive information such as prices, output, supplies, costs, and purchasing and sales strategies.

177.    Defendants' information exchange has had the intended anti-competitive effects, including inter alia: (a) raising, fixing, maintaining, or stabilizing prices of Archery Products at an artificially high level; and (b) eliminating or suppressing, to a substantial degree, competition among the Manufacturer and Retailer Defendants for sales of Archery Products.

178.    Defendants' agreement, combination, and/or conspiracy to exchange competitively sensitive information violates Section 1 of the Sherman Act under either a "quick look," or "rule of reason" analysis because the exchange results in the described anticompetitive effects with no

44

valid procompetitive justifications. Any proffered procompetitive justifications do not outweigh the anticompetitive effects and could have been reasonably achieved through means less restrictive of competition.

179. Each Defendant and co-conspirator has participated in one or more overt acts in furtherance of the information exchange.

180. As a direct and proximate result of Defendants' contract, combination, and conspiracy to exchange competitively sensitive information, Plaintiff and Class Members have suffered injury to their property and have been deprived of the benefits of free and fair competition on the merits. Absent the conspiracy to exchange competitively sensitive information, Plaintiff and Class Members would have paid less for Archery Products.

181. Plaintiff and Class Members seek three times their damages caused by Defendant's violations of Section 1 of the Sherman Act, the costs of bringing suit, reasonable attorneys' fees, and a permanent injunction enjoining Defendant from ever again entering into similar agreements in violation of Section 1 of the Sherman Act.

## X. REQUEST FOR RELIEF

WHEREFORE, Plaintiff, on behalf of themselves and the Class of all others so similarly situated, respectfully requests judgment against Defendants as follows:

A. That the Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative and its counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B. That the unlawful contract, combination, or conspiracy alleged herein be adjudged and decreed an unreasonable restraint of trade or commerce in violation of the Sherman Act and a

*per se* violation of the Sherman Act;

C.       That Plaintiff and the Class recover damages to the maximum extent allowed under federal law, and that a joint and several judgment in their favor be entered against Defendants in an amount to be trebled to the extent such laws permit;

D.       That Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained  from  in any manner continuing, maintaining, or renewing the contract, combination, or conspiracy alleged herein, or from entering into any other contract, combination, or conspiracy having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

E.       That Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of a company's information;

F.       That Plaintiff and the Class be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

G.       That Plaintiff and the Class recover their costs of suit, including reasonable attorneys' fees, expenses, and costs as provided by law; and

H.       That Plaintiff and the Class have such other and further relief as the case may require and the Court may deem just and proper.

## XI.    DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial pursuant to Federal Rule Civil Procedure 38(b) on any and all issues so triable.

Dated: July 14, 2024

Respectfully submitted:

By:   _/s/ Charles Barrett_____
Charles Barrett (TN#020627)
**CUNEO GILBERT & LADUCA, LLP**
4235 Hillsboro Pike
Suite 300
Nashville, TN 37215
Telephone: (615) 293-7375
cbarrett@cuneolaw.com

Michael J. Flannery
**CUNEO GILBERT & LADUCA, LLP**
2 CityPlace Drive
Second Floor
St. Louis, MO 63105
Telephone: (314) 226-1015
mflannery@cuneolaw.com

Evelyn Riley
Cody McCracken
**CUNEO GILBERT & LADUCA, LLP**
2445 M St., NW
Suite 470
Washington, DC 20037
Telephone: (202) 789-3960
evelyn@cuneolaw.com
cmccracken@cuneolaw.com

*Counsel for Plaintiff and the Proposed Class*